IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL FALLON,<br><br>    *Plaintiff*,<br><br>  v.<br><br>MERCY CATHOLIC MEDICAL CENTER<br>OF SOUTHEASTERN PENNSYLVANIA<br>D/B/A MERCY FITZGERALD HOSPITAL,<br>*et al.*,<br><br>    *Defendants*. | CIVIL ACTION<br>No. 16-00834 |

**PAPPERT, J.**                            August 9, 2016

<u>MEMORANDUM</u>

  Paul Fallon ("Fallon") opposes vaccines, believing that their benefits are exaggerated and risks minimized. He questions specifically the efficacy of vaccines for influenza as well as the stated number of flu-related deaths and hospitalizations annually in the United States. Fallon was fired by Mercy Catholic Medical Center ("Mercy")[1] for refusing to obtain a flu vaccination. Before his termination and in support of that refusal, Fallon submitted to Mercy a letter and twenty-two page essay.

  Fallon now sues Mercy for religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII" or "the Act"), 42 U.S.C. Section 2000e *et seq.*, and wrongful termination in violation of Pennsylvania public policy. Mercy moves to dismiss the complaint. While Fallon articulates numerous reasons for his unwillingness to be vaccinated, none of them are grounded in a sincere religious belief required to state a claim under Title VII. In addition,

---

[1]  Mercy is improperly named in the caption as "Mercy Catholic Medical Center of Southeastern Pennsylvania d/b/a Mercy Fitzgerald Hospital." (Def.'s Br. in Supp. of Mot. to Dismiss at 1, ECF No. 7.)

1

there is no public policy exception of the type Fallon seeks to the at-will employment doctrine in Pennsylvania.  The Court grants Mercy's motion.

## I.

Mercy hired Fallon in 1994 as a Psychiatric Crisis Intake Worker.  (Compl. ¶ 6, ECF No. 1.)  Beginning in 2012 Mercy required its employees to "either obtain a flu vaccination or submit an exemption form to obtain a medical or religious exemption."  (*Id.* ¶ 7.)  Those who were granted an exemption had to wear a mask.  (*Id.*)  In 2012 and 2013 Fallon sought exemptions "on the basis of a strong moral or ethical conviction similar to a religious belief."  (*Id.* ¶ 8.)  In each of those years Fallon provided Mercy with his lengthy essay "explaining his sincerely held moral and ethical convictions."  (*Id.*)  Mercy granted Fallon exemptions in both 2012 and 2013 and he accordingly wore a mask "during those flu seasons."  (*Id.* ¶ 9.)

Fallon applied for an exemption again in 2014 but was denied.  (*Id.* ¶ 10.)  On December 4, 2014 Chief Human Resources Officer John Cigler ("Cigler") told Fallon that Mercy changed its policy regarding exemptions.  (*Id.* ¶ 11.)  Cigler told Fallon that he needed to "provide a letter on official clergy letterhead supporting his exemption request."  (*Id.*)  Mercy gave Fallon an official warning on December 7, 2014 after he failed to obtain a flu vaccination or approved exemption.  (*Id.* ¶ 13.)

Four days later Fallon submitted his exemption request and essay, along with a letter explaining why he could not obtain a letter on clergy letterhead.  (*Id.* ¶ 14.)  Fallon's letter stated:

> As I state on the accompanying [form]: "I am not a member of an organized religion and thus cannot obtain a signature from Clergy."  In addition, I cannot submit a letter to you "from clergy on official letterhead explaining the religious doctrine or practice that must accompany this exemption request."

(Def.'s Reply Br. in Supp. of Mot. to Dismiss ("Def.'s Reply"), Ex. A at *13, ECF No. 9.)  Fallon's letter also explained the reasoning behind his exemption request:

> I call my belief system, "My Conscience" and it dictates what I must do to live in harmony with it. Not to do so, to act against it, to violate it, would be to commit a crime against oneself. Not to do so would entail a rejection of one's autonomy and a surrendering of one's body to others for their self-interest.
>
> My body belongs to me and from this fact it follows that the right to make a medical risk decision belongs to me alone. This is why the ethical practice of medicine has as its foundation the concept of "informed consent" which is voluntary by definition as opposed to mandatory "informed consent."

(*Id.*)

The twenty-two page essay attached to the letter consisted of seven subsections titled: The Lack of Evidence Based Medicine; 36,000 Average Annual Flu Deaths – Fact or Fiction?; Risks Involved in Influenza Vaccination; Criminality and the Pharmaceutical Industry; The Mandatory Influenza Vaccination Controversy; Why is there an Influenza Vaccination Controversy?; and Mandatory Consent. (*Id.* at *15–36.) In the subsection titled "Mandatory Consent," Fallon quotes Siddhartha Gautama, the founder of Buddhism:

> Do not believe in anything simply because you have heard it. Do not believe in anything simply because it is spoken and rumored by many. Do not believe in anything merely on the authority of your teachers and elders. Do not believe in traditions because they have been handed down for many generations. But after observation and analysis, when you find that anything agrees with reason and is conducive to the good and benefit of one and all, then accept it and live up to it.

(*Id.* at *31; Compl. ¶ 24.) Fallon concluded the essay by stating:

> Based on my analysis, the influenza vaccine has not been shown to be effective, its benefits are grossly inflated, its risks are dangerously downplayed, the lethality of the virus is grossly exaggerated, and the industry that produces the vaccine "is the biggest defrauder of the federal government under the False Claims Act." This industry does not have a conscience, it knows nothing about right and wrong and "it is compelled to cause harm [to me] when the benefits of doing so outweigh the costs." By yielding to coercion and "consenting" to the hospital mandatory policy I would violate my own conscience as to what is right and what is wrong. Consequently I am compelled to follow my conscience and refuse the influenza vaccine.

(Def.'s Reply, Ex. A at *31.)

3

Cigler denied Fallon's request and issued another warning on December 12, 2014. (*Id.* ¶ 15.) Four days later Sue Szilagyi ("Szilagyi"), Patient Care Manager, informed Fallon that he was suspended pending termination. (*Id.* ¶ 16.) Over the next three weeks Fallon, Szilagyi and Cigler discussed Fallon's "removal from the schedule and potential termination." (*Id.* ¶ 17.) Mercy ultimately terminated Fallon in early January 2015 for failing to comply with the vaccination policy. (*Id.* ¶ 18.)

Fallon properly exhausted his administrative remedies and filed his complaint on February 22, 2016. (ECF No. 1.) Mercy filed its motion to dismiss on June 1, 2016, Fallon responded on June 14 and Mercy replied on June 21. (ECF Nos. 7–9.) The Court held oral argument on Mercy's motion on July 26, 2016. (ECF No. 11.)

## II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "mere possibility of misconduct" is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court must construe the complaint in the light most favorable to the plaintiff. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted). A court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). Whether a complaint states a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

Under *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. *See Connelly*, 809 F.3d at 787. First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

### III.

At oral argument Fallon objected to the Court considering his letter and essay on the grounds that the documents were not attached to the complaint. (Oral Arg. 24:1–4, ECF No. 12.) Mercy attached the documents to its reply brief. (*See* Def.'s Reply, Ex. A.) A district court ruling on a motion to dismiss generally may not consider matters extraneous to the pleadings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). However, "an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *Id.* (citation and internal quotations omitted). Fallon's complaint explicitly cites and relies upon a number of passages from the essay that he submitted to Mercy. (*See* Compl. ¶¶ 24–27.) The essay and letter provide the basis for Fallon's exemption request and subsequent termination; they are both "integral to" and "explicitly relied upon in the complaint." *In re Burlington*, 114 F.3d at 1426.

## IV.

Count I of Fallon's complaint alleges a claim for religious discrimination against Mercy under Title VII.[2] (Compl. ¶¶ 19–47.) Title VII prohibits employers from discharging or disciplining an employee based on their religion. *See Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009) (citing 42 U.S.C. § 2000e–2(a)(1)). The Act extends protection to "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the . . . employer's business." 42 U.S.C. § 2000e(j). To establish a prima facie case of religious discrimination, Fallon must show that: (1) he holds a sincere religious belief that conflicts with a job requirement; (2) he informed his employer of the conflict; and (3) he was disciplined for failing to comply with the conflicting requirement. *See Webb*, 562 F.3d at 259 (citing *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000)).

Mercy contends that Fallon fails to establish a "religious belief." (Def.'s Br. in Supp. of Mot. to Dismiss ("Def.'s Mot.") at 5, ECF No. 7.) Fallon argues that while he "does not belong to a religious congregation, . . . [he does have] strong and sincerely held moral and ethical beliefs regarding the flu vaccination that satisf[y] the definition of 'religious belief.'" (Pl.'s Br. in Resp. to Def.'s Mot. ("Pl.'s Resp.") at 4, ECF No. 8; Compl. ¶¶ 12, 36.) The primary dispute at this stage is therefore whether Fallon's beliefs are "religious" such that they are protected under the law.

---

[2] Count III of Fallon's complaint alleges a religious discrimination claim against the John Doe Defendants. (Compl. ¶¶ 59–61.) The Court's analysis under Count I therefore applies to Count III as well.

## A.

"Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion." *Africa v. Commw. of Pa.*, 662 F.2d 1025, 1031 (3d Cir. 1981). Nonetheless, "Title VII does require the . . . courts to evaluate a plaintiff's claimed entitlement to accommodation of their religious principles." *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 136 (3d Cir. 1986). When making this determination, the Court must distinguish between constitutionally protected religious observances and mere desires or preferences not subject to accommodation. *See Prewitt v. Walgreens Co.*, No. 11-cv-02393, 2012 WL 4364660, at *8 n.15 (E.D. Pa. Sept. 25, 2012).

Beliefs are protected under Title VII when they are "(1) sincerely held, and (2) religious in nature, in the claimant's scheme of things." *Africa*, 662 F.2d at 1030 (citing *United States v. Seeger*, 380 U.S. 163, 185 (1965)). While the Court acknowledges "that a determination of whether . . . beliefs are religious and entitled to constitutional protection presents a most delicate question," it must "at the same time . . . recognize that the very concept of ordered liberty precludes allowing [Fallon], or any other person, a blanket privilege to make his own standards on matters of conduct in which society as a whole has important interests." *Id.* at 1031 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972)) (internal quotation marks omitted).

Courts have moved beyond "the wholly theistic interpretation" of the term religion. *Id.* To assess "non-traditional religious belief[s] or practices, the courts . . . look[] to the familiar religions as models in order to ascertain, by comparison, whether the new set of ideas or beliefs is confronting the same concerns, or serving the same purposes, as unquestioned and accepted religions." *Africa*, 662 F.2d at 1032 (quoting *Malnak v. Yogi*, 592 F.2d 197, 207 (3d Cir. 1979) (concurring opinion)) (internal quotation marks and formatting omitted). For example, in *United*

7

*States v. Seeger*, the Supreme Court of the United States analyzed whether conscientious objectors to the military draft were entitled to exemptions under the Universal Military Service and Training Act.  At issue was whether the exemption, which applied to those who held a belief "in a relation to a Supreme Being," could apply to those who did not believe in "a traditional God." *Seeger*, 380 U.S. at 178.  The Court held that "the test . . . is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption." *Seeger*, 380 U.S. at 166.  The Court further "narrow[ed] the inquiry" by expressly excluding "those persons who . . . decide on the basis of essentially political, sociological or economic considerations" and "those whose opposition . . . stems from a merely personal moral code." *Id.* at 173 (internal quotation marks omitted).

Applying this framework, the Third Circuit Court of Appeals in *Africa* analyzed whether an appellant's "non-traditional" religious beliefs were protected under the First Amendment. *Africa* involved a prisoner who claimed to be a "Naturalist Minister" for MOVE.  MOVE was purportedly a "'revolutionary' organization 'absolutely opposed to all that is wrong.'" *Africa*, 662 F.2d at 1026.  Because MOVE's ideology required its followers to "live in harmony with what is natural, or untainted," appellant claimed that the state had to provide him a special diet consisting entirely of raw foods. *Id.* at 1027.

The Third Circuit identified three "useful indicia" to aid in determining whether the appellant's belief was religious and therefore entitled to protection under the law:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters.  Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching.  Third, a religion often can be recognized by the presence of certain formal and external signs.

*Id.* at 1032. Though the Court must flexibly and carefully consider each belief system, "it is important to have some objective guidelines in order to avoid Ad hoc justice." *Malnak*, 592 F.2d at 210.

**B.**

**i.**

Under the first factor set forth in *Africa*, the Court considers whether Fallon's beliefs stem from a system that addresses fundamental and ultimate questions. *See Africa*, 662 F.2d at 1032. The Third Circuit in *Africa* found that the appellant's beliefs did not fulfill this factor because his "mindset seem[ed] to be far more the product of a secular philosophy than of a religious orientation." *Id.* at 1033. The Court observed:

> [Appellant's] concerns appear personal (e.g., he contends that a raw food diet is "healthy" and that pollution and other such products are "hazardous") and social (e.g., he claims that MOVE is a "revolutionary" organization, "absolutely opposed to all that is wrong" and unable to accept existing regimes), rather than spiritual or other-worldly.

*Id.* at 1033–34.

Fallon's "mindset" is similarly more personal and social than spiritual. For example, Fallon contends that the flu vaccine "has not been shown to be effective, its benefits are grossly inflated, its risks are dangerously downplayed, the lethality of the virus is grossly exaggerated, and the industry that produces the vaccine 'is the biggest defrauder of the federal government under the False Claims Act.'" (Def.'s Reply, Ex. A at *31.) Fallon's essay disputes the effectiveness of the flu vaccine and the motives of the pharmaceutical industry. (*See, e.g., id.* at *21 ("If prescription drugs really do kill 200,000 Americans each year or even half that number, why should a reasonable person believe that vaccines are any safer?"); *Id.* at *24 ("If I was inebriated as a result of imbibing pharmaceutical money, things might 'appear' differently to me

also. Money does have that power; it can alter what you say publicly.").) The essay is best described as a lengthy editorial on contentious social issues—*i.e.*, the effectiveness and propriety of vaccinations and the motivations of those who make and sell them.

Additionally, Fallon's belief is personal and untethered to any "spiritual or other-worldly mandate." *Africa*, 662 F.2d at 1033–34. His letter to Mercy states:

> By yielding to coercion and "consenting" to the hospital mandatory policy *I* would violate *my own* conscience as to what is right and what is wrong . . . . *I* call *my* belief system, "*My* Conscience" and it dictates what *I* must do to live in harmony with it. Not to do so, to act against it, to violate it, would be to commit a crime against *oneself*.

(*Id.* at *13 (emphasis added).) The Supreme Court specifically excluded from the definition of "religious" this type of opposition which "stems from a merely personal moral code."³ *Seeger*, 380 U.S. at 173.

**ii.**

Under *Africa*'s second factor, the Court looks to whether Fallon's belief "is comprehensive in nature" such that "it consists of a belief-system as opposed to an isolated teaching." *Africa*, 662 F.2d at 1032. "A religion is not generally confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive 'truth.'" *Malnak*, 592 F.2d at 209. The *Africa* Court noted that the appellant's belief system "appear[ed] to consist of a single governing idea, perhaps best described as philosophical naturalism. Apart

---

³ The fact that Mercy, mistakenly or otherwise, granted Fallon two prior exemptions does nothing to confer upon him a sincere religious belief under the law. Just as an employer can properly withdraw an accommodation in the disability discrimination context, Mercy was free to reevaluate whether Fallon's stated reasons for seeking a religious exemption to the required flu vaccination were in fact based on a sincere religious belief. *See, e.g.*, *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 671 (3d Cir. 1999) (finding that employer properly withdrew accommodation where it "exceeded [what the] the law required"); *Hancock v. Washington Hosp. Ctr.*, 13 F. Supp. 3d 1, 6 (D.D.C. 2014), *aff'd sub nom. Hancock v. Washington Hosp. Ctr.*, 618 F. App'x 4 (D.C. Cir. 2015) ("[T]he mere fact that an employer voluntarily accommodates an employee's disability by temporarily eliminating an essential function does not mean that the employer has irrevocably waived the essential function of the job.").

from this desire to live in a 'pure' and 'natural' environment, . . . little more of substance [could] be identified about the [appellant's] ideology." *Africa*, 662 F.2d at 1035.

Fallon's belief system is similarly singular. Fallon argues that he has "strong and sincerely held moral and ethical beliefs *regarding the flu vaccination*." (Pl.'s Resp. at 4 (emphasis added).) His essay consists of a "single governing idea," best described as anti-vaccination. Were the Court to conclude that this singular focus "satisfied the comprehensiveness criterion, it would be difficult to explain why other single-faceted ideologies—such as economic determinism, Social Darwinism, or even vegetarianism—would not qualify as religions." *Africa*, 662 F.2d at 1035.

Fallon contends that his belief system has a broader scope: specifically, that one cannot "reject[] . . . one's autonomy and surrender[] . . . one's body to others for their self-interest." (Def.'s Reply, Ex. A at *13.) Recasting his beliefs in this manner does not transform them from the singular into a larger belief set. Finding that a belief untethered to any religious conviction satisfies *Africa*'s comprehensiveness requirement would eviscerate any limiting principle under Title VII's definition of religion. The "very concept of ordered liberty" precludes such an approach. *Africa*, 662 F.2d at 1031 (quoting *Yoder*, 406 U.S. at 215–16) (internal quotation marks omitted).

### iii.

*Africa*'s third factor requires the Court to consider the structural characteristics of Fallon's belief system. *Id.* at 1032. For this analysis the Court need look no further than Fallon's letter to Mercy stating that he is "not a member of an organized religion." (Def.'s Reply, Ex. A at *13.) While the Court acknowledges that a lack of formal structure is not required, it must nonetheless consider structural characteristics to determine whether Fallon's

belief system is "analogous to those 'traditional' organizations that have been recognized as religions." *Africa*, 662 F.2d at 1036. The essay's passing reference to a quote from Buddha is immaterial because Fallon concedes he is not Buddhist. (Oral Arg. 36:10–16.) This factor therefore also weighs against finding that Fallon's belief system is "religious" under Title VII.[4]

**iv.**

Fallon contends that the Court should follow the definition of "religious beliefs" promulgated by the Equal Employment Opportunity Commission ("EEOC") in 29 C.F.R. Section 1605.1, which states:

> In most cases whether or not a practice or belief is religious is not at issue. However, in those cases in which the issue does exist, the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. This standard was developed in *United States v. Seeger*, 380 U.S. 163 (1965) and *Welsh v. United States*, 398 U.S. 333 (1970).

First of all, in enacting Title VII Congress "did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title." *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975)). This does not mean that the Court may not consider the guidelines. *See id.* "But it does mean that courts properly may accord less weight to such guidelines than to administrative regulations which Congress has declared shall have the force of law, or to regulations which under the enabling statute may themselves supply the basis for imposition of liability." *Id.* In any event, the Court's decision is consistent with the EEOC's definition.

---

[4] At oral argument, Fallon also claimed that Mercy discriminated against him because he has no religion. (Oral Arg. 38:12–40:6.) Specifically, Fallon contends that Mercy's clergy letter requirement was discriminatory because he had no "clergy person" and did not "belong to a congregation." (*Id.* 40:1–2.) Fallon's personal views, however, are distinguishable from "the 'secular moral system[s] . . . equivalent to religion except for non-belief in God.'" *Real Alternatives, Inc. v. Burwell*, 150 F. Supp. 3d 419, 440 (M.D. Pa. 2015) (quoting *Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 872 (7th Cir. 2014)). Those systems "are organized, full, and provide a comprehensive code by which individuals may guide their daily activities." *Id.* The structural characteristics of those systems are fundamentally different than Fallon's belief system which consists solely of his "conscience" and personal moral code.

Fallon's argument—that he need "only . . . demonstrate that he holds a moral or ethical belief which is sincerely held with the strength of traditional religious views"—misinterprets the EEOC's guideline. (Compl. ¶ 36.) First, the EEOC derived the definition in Section 1605.1 from *Seeger* and *Welsh*, cases which both exclude from "religious beliefs" those that are based "merely on a personal moral code." *See Seeger*, 380 U.S. at 173; *Welsh*, 398 U.S. at 342. Moreover, the EEOC's Compliance Manual states: "beliefs are not protected merely because they are strongly held.  Rather, religion typically concerns 'ultimate ideas' about 'life, purpose, and death.'  Social, political, or economic philosophies, as well as mere personal preferences, are not 'religious' beliefs protected by Title VII."  EEOC Compliance Manual § 12-I(A)(1), 2008 WL 3862103 (2008).

In sum, Fallon clearly fails to state a claim for religious discrimination under Title VII. He does not belong to a religious congregation, nor does he claim that his reasons for refusing to be vaccinated are based on "religious beliefs," sincerely held or otherwise.  To the contrary, Fallon's stated opposition to vaccinations is entirely personal, political, sociological and economic—the very definition of secular philosophy as opposed to religious orientation.  To adopt Fallon's argument that he need only show a strongly held moral or ethical belief in lieu of a sincere religious belief would contravene Third Circuit and Supreme Court precedent and would potentially entitle anyone with "strongly held" beliefs on any topic to protection under Title VII's religious discrimination provision.[5]

---

[5] Fallon cites to *Peterson v. Wilmur Comm., Inc.*, 205 F. Supp. 2d 1014, 1022 (E.D. Wis. 2002) in support of his position.  In *Peterson*, the United States District Court for the Eastern District of Wisconsin held that an employee's membership in the World Church of the Creator was a "religious" belief—even though the organization's central tenet was white supremacy—because "it function[ed] as religion in [plaintiff's] life." *Peterson*, 205 F. Supp. 2d at 1022.  Specifically, the employee had been a minister in the church for more than three years, worked to put the church's teachings into practice and actively worked to convert others to the faith.  *See id.* at 1022–24.  Putting aside the clearly distinguishable facts and the non-binding nature of the decision on this Court, the EEOC observed that "the *Peterson* court might have reached a different conclusion had it considered whether the belief was merely one-dimensional and thus not religious, *i.e.*, not part of a moral or ethical belief system

**V.**

Count II of Fallon's complaint alleges that Mercy wrongfully terminated him "in violation of public policy."[6] (Compl. ¶¶ 48–58.) "Whether a cause of action for wrongful termination exists in Pennsylvania is a question of law and, thus, can be decided under Rule 12(b)(6)." *Prewitt v. Walgreens Co.*, No. 12-cv-6967, 2013 WL 6284166, at *3 (E.D. Pa. Dec. 2, 2013) (citing *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 613 (3d Cir. 1992)). To establish a claim for wrongful discharge in the at-will employment context, Fallon must show that his termination "threaten[ed] clear mandates of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009) (quoting *Clay v. Advanced Comput. Applications, Inc.*, 559 A.2d 917, 918 (Pa. 1989)).

Fallon "must do more than show a possible violation . . . that implicates only [his] own personal interest." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 289 (Pa. 2000). Rather, he must show "that some public policy of this Commonwealth is implicated, undermined, or violated because of the employer's termination." *Id.* This exception is granted in "only the most limited of circumstances." *Weaver*, 975 A.2d at 563. Pennsylvania courts have found a clear mandate of public policy threatened on very few occasions. *See, e.g.*, *Field v. Phila. Elec. Co.*, 565 A.2d 1170 (Pa. Super. Ct. 1989) (discharging plaintiff after reporting nuclear safety violations); *Hunter v. Port Authority*, 419 A.2d 631 (Pa. Super. Ct. 1980) (denying plaintiff public employment on the basis of a prior conviction for which he had been pardoned); *Reuther v. Fowler & Williams, Inc.*, 386 A.2d 119 (Pa. Super. Ct. 1978) (discharging plaintiff for fulfilling jury duty).

---

concerning 'ultimate ideas' about 'life, purpose, and death.'" EEOC Compliance Manual § 12-I(A)(1) n.28, 2008 WL 3862103 (2008).

[6] Count III of Fallon's complaint alleges a wrongful termination claim against the John Doe Defendants. (Compl. ¶¶ 59–61.) The Court's analysis under Count II therefore applies to Count III as well.

Fallon bases his wrongful termination claim on Article I, Section 3 of the Pennsylvania Constitution. The provisions in Article I, however, only limit state actors. *See Prewitt*, 2013 WL 6284166, at *3 (E.D. Pa. Dec. 2, 2013) (citing *Commw. by Shapp v. Nat'l Gettysburg Battlefield Tower, Inc.*, 311 A.2d 588, 592 (Pa. 1973)). "For this reason, Pennsylvania courts have declined to find a public policy exception for wrongful termination claims against non-state actors based on Article I of the Pennsylvania Constitution." *Id.* at *3. "Consequently, courts in the Third Circuit hearing wrongful discharge diversity cases have adopted Pennsylvania's reasoning that violations of Article I provisions by private employers do not warrant a finding of wrongful discharge under the public policy exception."[7] *Id.* The Court will not extend Pennsylvania's public policy exception on the facts of this case. *See, e.g.*, *Weaver*, 975 A.2d at 563 ("In our judicial system, the power of the courts to declare pronouncements of public policy is sharply restricted.") (citation omitted).

## VI.

Federal Rule of Civil Procedure 15(a) provides that "courts may grant . . . amendments 'when justice so requires.'" *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003), *as amended* (Jan. 20, 2004) (citing FED. R. CIV. P. 15(a)). While Rule 15 states that "leave to amend should be 'freely given,' a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Id.* "Futility" means that the amended complaint would fail to state a

---

[7] To the extent Fallon's wrongful termination claim relies on the PHRA as the statutory basis for his claim, the Pennsylvania Supreme Court has held "that neither the PHRA nor the Equal Rights Amendment provides a public policy exception to the at-will employment doctrine for . . . discrimination by an employer not covered by the PHRA." *Weaver*, 975 A.2d at 572 (Pa. 2009).

claim upon which relief could be granted.  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (citing *In re Burlington*, 114 F.3d at 1434).

Fallon requested leave to amend both in his response brief and at oral argument.  (Pl.'s Resp. at 18; Oral Arg. 73:4–10.)  Amendment would be futile because any amended complaint would fail to state a claim upon which relief could be granted.  Fallon's exemption request, essay and letter establish that his belief is not "religious" and thus conceivably protected under Title VII.  Moreover, he cannot identify a judicial determination (or any other authority) in either Pennsylvania or this Circuit which supports his wrongful termination claim.  The Court accordingly denies Fallon's request.

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.